IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00155-CR

 

Rickey Lynn Harrison, Sr.,

                                                                      Appellant

 v.

 

The State of Texas,

                                                                      Appellee

 

 

 



From the 54th District Court

McLennan County, Texas

Trial Court No. 2003-993-C

 



DISSENTING Opinion

ON PETITIONS FOR DISCRETIONARY
REVIEW[1]



 

          I believe the majority has decided the
wrong issue.  I would like to define a clear, short, and direct path to an
answer of why the testimony of Hazel Evans put Harrison’s character for whether
he was a sweet, good person, who could not hurt the baby, in issue.  The entire
discussion, however, is very messy because there was not a good, clear
objection that we can focus our attention upon.  In fact, as will be seen from
the record set out verbatim, there was no objection at all.  But the issue, the
fundamental decision of the trial court that is being attacked, is did the
trial court abuse its discretion when it determined that the substance of Hazel
Evans’s testimony was as a character witness on a relevant trait, Harrison’s
character for being the type person who would not injure a child because he was
a sweet, good person.  I would hold that on the record before us, the trial
court did not abuse its discretion when it determined that Evans was a
character witness and allowed the State to inquire into specific instances of
conduct.

          First, it is important to note, and
the majority concedes, that Evans gave opinion testimony.  Maj. Opinion at 12. 
(“The issue is whether the defense witness’s volunteered and nonresponsive opinion
testimony nevertheless placed Harrison’s character at issue….”) (emphasis
added).  

          The majority also concedes that
Evans’s statements were not limited to Harrison’s interaction with children. 
Maj. Opinion at 11.  (“We do not agree [with Harrison] that the witness’s statement
that Harrison is a ‘good and sweet’ person was limited to his interaction with
children.”).

          But the majority wants to frame the
issue differently than Harrison did at trial and on appeal.  The majority
substantially narrows the issue.  Though it discusses, in general terms, all
the questions asked Evans, the majority wants to focus on only part of the
testimony, a single non-responsive answer to which there was no objection.  

          To the extent there was an issue
presented at trial, the one pursued by the majority is not the one raised by Harrison.  At trial, Harrison made no objection.  For this reason alone, the issue could be
overruled.

          But given that the trial court
“overrule[d] the objection,” I will look further for an implied objection, a
concept I do not believe exists.  The argument, from which the objection must
be implied, is that the response had to be considered in the context of Evans’s
general testimony and therefore, “had to do with the children.”  RR IV, pg.
199, lines 22-23.

          Harrison’s appellate counsel,
obviously aware that the issue on appeal must comport with the objection made
at trial, makes the same argument on appeal.  Appellate counsel frames the
issue with the following statement:  “Defense counsel responded by stating
that the witness was not referring to Appellant’s character in the community,
that she was describing his character around her children.”  Appellant’s
Brief at 9 (emphasis in original).  And in counsel’s summary of the argument,
he states:  “Said witness was not a character or reputation witness for
Appellant, because the tenor of her entire testimony was that Appellant
was a good person to his and her children.”  Id. at 6 (emphasis added).

          The majority clearly disposes of this
argument by the acknowledgement mentioned earlier that the witness’s testimony
was not limited to Harrison’s interaction with children.  Thus, if we stopped
the analysis with whether the response was limited to Harrison’s interaction
with his and Evans’s children, we would overrule the issue.

          But the majority reframes the issue. 
The issue they want to pursue is whether the “volunteered and nonresponsive
opinion testimony” alone, the answer to a single question, put Harrison’s character in issue.  This subtle reframing of the issue is what allows the
majority to reach the wrong result, in part because they can then cite
inapplicable authority for that result.  And, if we must answer the majority’s
issue, I would contend that even the single answer by Evans put her opinion of Harrison’s character in issue.  And by the manner in which Harrison presents his argument,
he also apparently concedes that if the opinion testimony is not read as being
limited to his child or Evans’s children, this issue is a loser.

          Harrison characterizes Evans in the
following manner:

The other five witnesses were called to testify
as to what kind of father Appellant was or how he interacted with his child, or
other children he was around. 
The final defense witness during the guilt/innocence phase was one Hazel Evans
….

 

Appellant’s Brief at 8 (emphasis in original).

          In the context of this trial, Hazel
Evans can easily be viewed as a character witness, and the State was fully
justified in questioning the witness about the basis of the testimony she
gave.  The trial court was very careful to make sure the testimony was not
qualified in any manner as to his character of being a sweet, good person, a
person who this witness could not “believe for even a minute that he would
hurt” the baby.

          But the best way to understand what
went on at trial and why there was no error is to review the entire record of
this witness’ testimony.

HAZEL EVANS,

Having been first duly sworn, testified as
follows:

 

                             THE COURT:  Have a
seat, ma’am.

 

DIRECT EXAMINATION

 

BY MR. HUNT:

 

          Q.      Ms. Evans, I’m going to ask
you to state your name please, for us?

          A.      Hazel Marie Evans.

          Q.      Okay.  Ms. Evans, I’m going to
ask you to do something that’s a little bit difficult for folks, and that is,
I’m sitting over here but it’s these 12 good folks here that have to hear what
you’ve got to say.  So what I’d ask you to do is talk to them.  You can listen
to me but talk to them.  Would you do that for me?

          A.      Yes, sir.

          Q.      Okay.  Tell us a little bit
about yourself.  Tell us where you live and maybe where you work.

          A.      Well, my name is Hazel Evans. 
I’m a, uh – I started doing my CNA classes at Willing Springs Nursing Home, and
I live at 920 Cleveland in east of south Waco.

          Q.      You said “CNA classes,” what’s
that?

          A.      Certified nurse’s aid.

          Q.      Okay.  All right.  Great. 
Could you tell us how you know Rickey Harrison?

          A.      Well, I know Rickey through my
son, Dedrick Evans.  They was good friends.  He was a sweet person.  He’s [sic]
was a good person.  He used to stay the nights at my house.  He done watched my
kids and I didn’t have a problem with him.

          Q.      Rickey stayed nights at your
house?

          A.      Yes.

          Q.      Okay.  And he’d watch your
kids?

          A.      Uh-huh.  He’s watched my kids
before, played with them, everything.

          Q.      Okay.  And how old were your
kids when Rickey was doing that?

          A.      Ooh, my babies was, like,
seven and eight.

          Q.      Okay.  Rickey ever beat up on
your little babies?

          A.      No, I never had that problem.

          Q.      Okay.  Did you ever see Rickey
as he interacted with his own baby, Baby Rickey?

          A.      Well, I have seen him with his
son.  He done brought him to my house, let me see him.  He done took him to my
mom’s, let him [sic] see him, and it wasn’t a problem.

          Q.      Did he act like he liked the
kid?

          A.      Yes, he loved his baby.

          Q.      Did he ever – did he ever hurt
him?

          A.      No, he had not.

          Q.      Do you believe for even a
minute that he would hurt him?

          A.      No.

          Q.      Okay.  Do you know Jalisa,
Jalisa who is the aunt of Baby Rickey?

          A.      Yes, I do.

          Q.      Okay.  Can you describe for
the members of the jury how you know Jalisa?

          A.      I used to live right next door
to them at 1104 Calumet.

          Q.      Okay.  And what did you see
Jalisa do?  Was she a little peaceful little girl who played with dollies or
something?

          A.      No, sir.

          Q.      Describe for the members of
the jury what you saw Jalisa do.

          A.      Well, it was numerous times
her and my daughter got into it.  Her and my daughter had a fight.  She chased
my baby with a butcher knife.

          Q.      Who chased your baby with a
butcher knife?

          A.      Jalisa.  She chased my
daughter, Shaquera with a butcher knife and – and plenty of times they done
fought.  She was – you know, she was a child but she also was started stuff in
the neighborhood.  Always fighting.  Her and my daughter stayed into it.

          Q.      How old was your daughter when
that happened?

                             MR. PARKER:  Judge,
we’re going to object at this time.  All of this stuff is irrelevant.

                             THE COURT:  And I
sustain the objection.

                             Instruct the jury
they’ll disregard the last statement of the witness for any purpose.

          Q.      (BY MR. HUNT)     How often
did you observe Jalisa?  How – how – how often did you see her and know her?

          A.      Well, I stayed over there at
Stella Maxi for a year and a half.

          Q.      Okay.  And Jalisa would have
been how old during that time period?

          A.      Huh.  I do not know.  But I
know my daughter – my daughter is 13 now, so my baby was, like, 10.

          Q.      Okay.  So how about – about
how long ago was that that we’re talking about?  It was about three years ago,
going on three years.

          Q.      All right.  Okay.

                             MR. HUNT:  We’ll
pass the witness, Your Honor.

                             MR. PARKER:  Can we
approach the bench, Your Honor.

                             THE COURT:  All
right.

                             (whereupon, the
Court, counsel and defendant were present in chambers)

                             THE COURT:  All
right.  Now, we’re on the record outside the jury.

                             MR. PARKER:  Judge,
before we ask the questions in front of the jury, we wanted to inform the Court
and the defense that we believe that the defense has now opened the door to,
um, questioning this witness concerning, um, her statement – her statements,
the defendant was a sweet and good person.  And we would like – we believe that
she’s testifying as a character witness for him, and we would therefore like to
ask her if, uh, if she was aware that he had been arrested and put on probation
for an assault back in 2001.  Uh, if she was aware that he had been arrested
and placed on probation for assault on a public servant in 2002.  If she was
aware that he had been, uh, given a citation for disrupting class in March of
2002.  Uh, just ask her if – if any of that information would change her
opinion as to whether or not he was, in fact, a sweet and a good person.

                             MR. HUNT:  If I
could respond to that, Your Honor.  I believe that she said around her children
he was a sweet and good person.  She did not say his character in the – in the
community is that of a sweet and loving person.  She described his character
around her children.

                             THE COURT:  Okay.

                             MS. WALKER:  I
didn’t hear her qualify it, but I just heard her say he’s a sweet and good
person but it wasn’t pursuant to any question, I would admit that.

                             THE COURT:  Let –
let’s go back and look at the testimony.  How hard would that be to find?

                             THE REPORTER: 
Okay.

                             THE COURT:  In
other words, do we need to recess them until in the morning?

                             THE REPORTER:  Um,
I can quick try and do a search.

                             Okay.

ANSWER:  “Well, I know Rickey through my son,
Dedrick Evans.  They was good friends.  He was a sweet person.  He’s [sic] was
a good person.  He used to stay the nights at my house.  He done watched my
kids and I didn’t have a problem with him.

                             MR. PARKER:  Judge,
it’s our contention that there was no qualification on the answer.  She says,
he’s a sweet person, good person.

                             MR. HUNT:  The
question I think had to do with the children, Your Honor.

                             THE COURT: 
Overrule the objection.  Let’s go ahead.

                             (whereupon, the
following proceedings took place in the courtroom.  The Court, counsel, and
defendant and jury present.)

                             THE COURT:  Go
ahead.

 

CROSS-EXAMINATION

 

BY MR. PARKER:

 

Q.      Ms. Evans, you had earlier – earlier
stated during your testimony for Mr. Hunt, you said that – that, uh, Rickey
Lynn Harrison, Sr., is that the guy that’s seated to the right of Mr. Hunt?

A.      Uh-huh.  Yes, sir.

Q.      That he was a sweet and good person; is
that correct?

A.      Yes, he was.

Q.      Okay.  And Ms. Evans, were you aware
that in July of 2001, that Rickey Lynn Harrison was arrested for assault and
subsequently went to juvenile for that?

A.      Yes, I was aware.

Q.      Okay.  Ms. Evans, were you aware that in
– on June the 10th of 2002, that he was adjudicated for assault on a
public servant in a – 

A.      No.

Q.      -- in a case here in McLennan County for an incident at Waco High School?

A.      No.

Q.      Were you aware that he had been given
citations, uh, for disrupting class back in 2002?

A.      No.

Q.      Knowing all this information, Ms. Evans,
do you still think he’s a sweet and good person?

A.      Yes, I do.  It’s been because he’s been
at my house plenty of times.  He have never done anything that would
disrespected me, never disrespected my house nor my kids.

Q.      Okay.

                   MR. PARKER:  Pass the witness,
Your Honor.

                   MR. HUNT:  We have no other
questions of this witness.

                   THE COURT:  You may step
down.  You’re excused, ma’am.

 

RR IV, pg. 194-201.

          When the purpose of calling a witness,
in context, is to provide that witness’s opinion as to the character of the
defendant to commit the act – Do you believe for even a minute that he would
hurt him? – the witness must be subject to cross-examination on the basis for
the opinion.  The discerning reader will note that there were two objectives
for using Evans as the final defense witness; to build up Harrison and to point
the finger at someone else, both to be accomplished by Evans’s opinion of the
persons to commit the act.

          The facts of this case are unlike
other cases in which a vague reference about a person by a witness testifying
on some other topic was attempted to be used to open the door to character
evidence.  The trial court was very careful to make sure the testimony was not
qualified as to Evans’s opinion of Harrison’s character as it related to interaction
with her children.  The State approached the bench when the witness was
passed.  The trial was suspended while counsel and the court reviewed the
recorded testimony in chambers.  Defense counsel argued that Evans described Harrison’s character around her children.  When the testimony was read back in chambers, it
was clear that the testimony was not limited in any manner.  And it must also
be remembered that counsel had asked a subsequent question which called for
Evans’s opinion of Harrison’s character:  “Do you believe for even one minute
that he [Harrison] would hurt him [the baby]?”  RR IV, pg. 196, lines 5-6.

          The only case relied upon by the
defense, Ward v. State, 591 S.W.2d 810 (Tex. Crim. App. 1978), and all
the cases relied upon by the majority, Rutledge v. State, 749 S.W.2d 50
(Tex. Crim. App. 1988); Stephens v. State, 660 S.W.2d 85 (Tex. Crim.
App. 1983); Nixon v. State, 653 S.W.2d 443 (Tex. Crim. App. 1983); Smith
v. State, 763 S.W.2d 836 (Tex. App.—Dallas 1988, pet. ref’d); Powell v.
State, 663 S.W.2d 465 (Tex. App.—Houston [1st Dist.] 1983, no pet.),
hearken back to a time when there was a distinction between the admissibility
of reputation-of-character evidence and opinion-of-character evidence.  Thus,
for example, in Rutledge, testing the basis of the witness’s opinion
testimony was not an issue because the testimony had not put the defendant’s reputation
into dispute.  Thus, these cases do not stand for the proposition for which
they are cited because the issue in these cases was whether the reputation
regarding the defendant’s character, as distinguished from the witness’s opinion
of the defendant’s character, was put into issue.  In this case, the State
argued that the testimony was opinion testimony regarding Harrison’s character.  The trial court agreed.  I agree with the trial court.  Even if I
did not agree with the trial court, I could not find that his decision was
outside the bounds of reasonable disagreement.  

          Because Evans’s testimony put her
opinion of Harrison’s character in evidence, the State was authorized to probe
the reliability of that opinion, so that the jury could give it the proper
weight, by inquiry into Evans’s knowledge of specific instances of conduct.  Tex. R. Evid. 405(a).  Defense counsel
did not object to the non-responsiveness of the answer to his question, did not
request an opportunity to clarify Evans’s testimony, did not request a limiting
instruction on the use of the State’s evidence, and did not object to its
unlimited use in argument by the State.  Finding no error in what the trial
court did, I would affirm the judgment.

 

                                                          TOM
GRAY

                                                          Chief
Justice

 

Dissenting
opinion delivered and filed October 19, 2005

 









[1]
Because the majority is withdrawing their
prior opinion and judgment, my dissenting opinion thereto, dated July 20, 2005,
is withdrawn.  While I would like to spend more time fine tuning this
dissenting opinion, the 30 day requirement of Rule 50 must be complied with.  Tex. R. App. P. 50.